# SEEBERGER v. WRIGHT AND LAWTHER OIL AND LEAD MANUFACTURING COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 219. Argued and submitted January 31, 1895. — Decided March 18, 1895.

An importer of flaxseed, containing an ascertainable percentage of impurities, composed of clay, sand, and gravel, is entitled to an allowance of that percentage in assessing duties upon the gross weight of the goods.

THIS was an action against the collector of customs for the port and district of Chicago, to recover certain duties paid under protest, upon an importation of flaxseed, which contained four per cent of impurities. The only question in the case was whether the importers were entitled to an allowance from the gross weight of the goods, of a percentage for impurities.

The case was tried without a jury under a stipulation, and the following facts found by the court:

"Plaintiff imported a quantity of flaxseed from Liverpool, which had been brought from Calcutta. The invoices show the gross weight and a tare of five pounds per bag, and a deduction of 'four per cent for impurities.' The collector, in assessing the duties, deducted the tare, which was the weight of the bags, but refused to allow anything for impurities, assessing a duty of twenty cents per bushel of fifty pounds upon the gross weight, less the tare. Plaintiff paid the duties so assessed under protest, appealed to the Secretary of the Treasury, by whom the action of the collector was affirmed,

and brought this suit in apt time to recover the excess of duties paid by reason of the refusal to make any deduction for impurities.

"The proof in this case shows without dispute that the seed contained dust, composed of clay, sand, and gravel to an average of four per cent."

Upon this finding of facts, the court entered judgment for the plaintiff, assessing its damages at $670.29, with interest. Defendant sued out this writ of error.

*Mr. Assistant Attorney General Whitney* for plaintiff in error.

*Mr. Percy L. Shuman* for defendant in error submitted on his brief.

*Mr. C. B. Alexander* by leave of court filed a brief on behalf of the National Lead Company in the interest of the defendant in error.

Mr. JUSTICE BROWN delivered the opinion of the court.

By Rev. Stat. § 2898 : "In estimating the allowance for tare on all chests, boxes, cases, casks, bags, or other envelope or covering of all articles imported liable to pay any duty, where the original invoice is produced at the time of making entry thereof, and the tare shall be specified therein, the collector, if he sees fit, or the collector and naval officer, if any, if they see fit, may, with the consent of the consignees, estimate the tare according to such invoice ; but in all other cases the real tare shall be allowed, . . . but in no case shall there be any allowance for draught."

This case turns really upon the meaning of the word "draught," the government claiming that it is a misspelling of the word "draff," which is defined as waste matter, sweepings, refuse, lees, or dregs.

The word first made its appearance in the thirty-fifth section of the tariff act of August 4, 1790, c. 35, 1 Stat. 145, 166, wherein an allowance was made for "the drafts and tare of

the articles subject to duty by weight." In this section it is spelled both " draft" and " draught." This provision was reënacted in the tariff act of March 2, 1799, c. 22, § 58, 1 Stat. 627, 671, the word being spelt " draft."

A judicial interpretation of the word is suggested in a dictum in the opinion of Mr. Justice Woodbury in *Marriott* v. *Brune*, 9 How. 619, 633, in which he says : " Another reduction is made in weight for tare and draft. This last should be *draff*, meaning dust and dirt, and not what is generally meant by ' draught' or 'draft.'" The case, however, did not call for a definition of the word.

There has been a peculiar use of the word " draught " in England. and perhaps also in this country, in connection with commercial transactions, in which it is defined as an arbitrary deduction from gross weight made by custom, to assure the buyer or importer, as the case may be, that there is no discrimination against him from difference in scales. In Webster's Dictionary of 1890 "draught" is defined as "an allowance on weighable goods;" and "draft" as "an allowance or deduction made from the gross weight of goods." In the Century and the Imperial, " draft" and "draught" are spoken of as an allowance made for waste in goods sold by weight, or the allowance made by the custom-house on excisable goods. The two words are in reality different spellings of the same word.

In *Napier* v. *Barney*, 5 Blatchford, 191, both draft and tare were allowed on sugar imported in bags, Mr. Justice Nelson observing : " Draft and tare, in a commercial sense and usage, have a separate and distinct meaning and application. The former is an allowance to the merchant when the duty is ascertained by weight, as in the present instance to insure good weight to him. . . . . It is to compensate for any loss that may occur from the handling of the scales, in the weighing, so that, when weighed the second time, the article will hold out good weight."

As the word " draught" or " draft" has a particular and uniform meaning given to it by the lexicographers, and such definition seems to be a reasonable one as applied to the statute in

question, we see no good reason for saying that it is a mere mis-spelling for "draff," especially in view of the fact that this is an unusual word, with a totally different meaning, and not found elsewhere in any tariff acts to which our attention has been called. The enactment in question seems to have been intended to prohibit a custom, which had grown up under the tariff act of 1790, and was probably inherited from the tariff laws of England, of making an arbitrary deduction from the gross weight, to which the importer was really not entitled.

Assuming, then, that the word "draught" refers to this arbitrary deduction and not to impurities, we think the court below was correct in assuming that the flaxseed in question, which is made dutiable by the act of 1883 at "twenty cents per bushel of fifty-six pounds," less the tare, means 56 pounds of clean seed, or at least seed freed from any accidental impurities, such as the clay, sand, and gravel in question. If this seed had been washed or otherwise cleansed of these impurities, it certainly will not be contended that they would be subject to an increased duty by means of such cleansing, or that a bushel of 56 pounds of such seed would be anything more or less than a statutory bushel. So if, without such cleansing, the amount of such impurities can be fixed at a certain percentage, as the findings in this case assume, we see no objection to the allowance being made, though the seed be not in fact cleansed.

The case is readily distinguished from *Earnshaw* v. *Cadwallader*, 145 U. S. 247, in which the question was whether, as a matter of fact, the term "iron ore," as known to persons familiar with the commerce respecting it, meant ore which had or had not been dried, and thus freed of the water which is naturally found in it. And as it appeared that dried ore was not known to commerce, that the allowance between dealers for the moisture that would be expelled by heating the ore had been based upon express contract or stipulation, and that no custom existed authorizing such allowance, except by contract, it was held that the tariff act referred to ore in its natural state. It was said, however, in the opinion of Mr. Justice Blatchford, that the principle of that case was different from that in regard

to dirt clinging to the skin of a potato, or clay, sand, or gravel mixed with flaxseed, such impurities being plainly discoverable and readily eliminated.

There was no error in the judgment of the court below and it is, therefore,

*Affirmed.*